# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD D. PARKELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No.14-446-SLR |
| | ) |
| CHRISTOPHER SENATO, et al., | ) |
| | ) |
| Defendants. | ) |

Donald D. Parkell, James T. Vaughn Correctional Center, Smyrna, Delaware. Pro se Plaintiff.

Joseph Clement Handlon and Kenisha LaShelle Ringgold, Deputy Attorneys General, Delaware Department of Justice, Wilmington, Delaware. Counsel for Defendants.

## MEMORANDUM OPINION

Dated: December 13, 2016
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff Donald D. Parkell ("plaintiff"), an inmate at the James T. Vaughn Correctional Center ("VCC"), Smyrna, Delaware, proceeds pro se and has been granted leave to proceed in forma pauperis. He filed this lawsuit on April 8, 2014, raising claims pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S. C. §§ 2000cc et seq. (D.I. 2) Following the July 26, 2016 memorandum opinion and order, only the § 1983 claims remain pending. (See D.I. 55, 56) Presently before the court are the parties' cross-motions for summary judgment (D.I. 45, 48) with supplemental briefs (D.I. 64, 65, 67), and plaintiff's unopposed motion for reconsideration (D.I. 57).[1] The court has jurisdiction pursuant to 28 U.S.C. § 1331. For the following reasons, the court will deny plaintiff's motion for summary judgment, will grant defendants' motion for summary judgment on the basis of qualified immunity, and will deny plaintiff's motion for reconsideration.

## II. BACKGROUND

Prior to July 16, 2012, Delaware Department of Correction ("DOC") operational procedures required that an inmate who desired a food preference for religious reasons contact the chaplain in writing. (See D.I. 45, ex. B at SOP A083). The procedure was changed in July 2012, as set forth in Policy No. 5.3,[2] to require an inmate seeking a

---

[1]A review of the court docket indicates that defendants have yet to file an answer to the complaint.

[2]The declaration of defendant Christopher Senato ("Senato") refers to Policy No. 5.3 and indicates that it is now DOC Policy 14.3. (D.I. 64, ex. 1) The declaration describes Policy 14.3 as attached as Ex. A, but it was not attached to the declaration

religious diet to self-report a religious faith, complete and sign a religious diet participation agreement form, have it signed by security staff, and submit it directly to the food services unit where, once received, the inmate is provided the appropriate meal within 24 to 48 hours. (*See* D.I. 45, ex. B Policy No. 5.3) The policy was implemented to provide the appropriate nutritional and caloric intake for all offenders in accordance with their faith-based requirements. (*Id.*) The stated purpose of the policy is to establish a religious diet program in support of the various faiths of the offender population housed within DOC facilities. (*Id.*)

Policy No. 5.3 provided kosher meals to practicing Jewish inmates as well as to non-practicing Jewish inmates, but non-practicing Jewish inmates only receive kosher meals during holiday observances. (*Id.*) The religious diet policy also provided meals in accordance with the Muslim observance of Ramadan and vegetarian meals for those inmates whose religion requires meals that are not satisfied by a regular diet. (*Id.*) The cost of serving an inmate a Ramadan diet is roughly the equivalent of serving an inmate who does not receive meals under the religious diet policy. (D.I. 64, ex. 1) The cost at the DOC for a non-religious diet (*i.e.*, a regular meal) averages $.60 per meal; a religious vegetarian diet averages $.60 per meal; and a kosher diet averages $5.82 per meal. (D.I. 45, ex. E) As of December 22, 2014, one inmate received kosher meals, and by October 12, 2016, the number had increased to ten inmates who receive kosher meals. (D.I. 45, ex. C; D.I. 64, ex. 1)

---

nor provided to the court.

VCC does not have a kosher kitchen and, therefore, kosher meals are prepackaged. (D.I. 60, ¶ 10) All items served as a kosher meal are certified kosher, including bread, cereal, jelly, sugar, milk, and fruit. (Id. at ¶ 16) Kosher meals total over 2100 calories per day which is comparable to the non-religious diets served at VCC. (Id. at ¶ 18)

Plaintiff has been housed at VCC since January 31, 2014. (D.I. 2) He was previously housed at Howard R. Young Correctional Institution ("HRYCI").[3] (D.I. 45, ex. D) Plaintiff practices a faith that combines the practice of Wicca and Judaism. (D.I. 2, ex. 4; D.I. 45, ex. D; D.I. 64, ex. 1 at 17-18) In his May 30, 2015 affidavit, plaintiff states that he had attempted to participate in the kosher religious diet plan for three years, but his attempts to follow God's law according to Judaic tradition were refused. (Id.) Plaintiff further explains that two main tenets of his faith that cannot be abandoned and that cannot be reconciled with Orthodox Judaism, are his belief in a feminine counterpart to God and magic. (Id.) He further explains that "the belief in magic and the practice of magic is deeply and almost exclusively Jewish." (Id.) Any attempt at applying a name to plaintiff's belief "is almost impossible." (Id.) Plaintiff has "studied at length many different religions and [his] chosen path is not lightly taken. [He has] weighed logic, history and faith in the unseen through introspection, debate and commonsense. What [he has] found, [plaintiff] believe[s] in completely." (Id.) Plaintiff

---

[3]While plaintiff was housed at HRYCI, he was informed that only Orthodox Jewish offenders were allowed to participate in the religious diet, and that he would have to eat vegetarian. Plaintiff explains that vegetarian is not kosher and he believes he should eat kosher according to his religion. (D.I. 64, ex. 1 at 42-44) Plaintiff further explains that a vegetarian meal at the VCC is prepared[s] in a nonkosher kitchen. (Id. at 59)

3

is "Jewish by all reason. [His] life is led according to the laws of Moses and the teachings of mystic scholars in Kabbalah and other sects of Jewish belief. [Plaintiff] sincerely believe[s] that God and Goddess demand that [he] only eat kosher food prepared according to Jewish law." (Id.) Plaintiff has "actively practiced this faith for about ten years." (Id.) Plaintiff has written numerous descriptions to defendants to explain his beliefs, but defendants refuse to respect this sect of Judaism. (Id.) When plaintiff was deposed on September 28, 2016, he brought with him several books that aid in the practice of his religion, including an encyclopedia on Jewish ethics, a journal of his religious beliefs, and a book plaintiff described as detailing the connection between the two belief systems, i.e., how Jewish magic can coincide with Kabbalistic and Jewish practices. (D.I. 64, ex. 1 at 10-15)

In February 2014, plaintiff contacted the VCC chapel office and indicated that he wished to change his faith to Judaism. (D.I. 2, ex. 2) Defendant Chaplain Frank Pennell ("Pennell") responded on February 20, 2014, and told plaintiff that, in reviewing plaintiff's file, he saw that plaintiff was identified as Roman Catholic or Wicca. (Id.) Pennell asked plaintiff if he was of Jewish descent or if he had contacted a rabbi to discuss the process of converting to the Jewish faith and told plaintiff that, once he had answered the questions, Pennell would send a form for processing plaintiff's change of faith. (Id.) Plaintiff responded to Pennell and, on February 25, 2014, Pennell sent plaintiff a change of faith form. (D.I. 2, ex. 2; D.I. 45, ex. B) Plaintiff returned the form on February 28, 2014, to change his religion from "Roman Catholic or whatever you

4

have me as to Jewish." (D.I. 45, Ex. B) Pennell approved the request to change plaintiff's religious belief on March 6, 2014. (Id.)

Pennell's answers to interrogatories state that, in the early 2000's, a rabbi directed defendants on the utilization of a kosher diet for validated Jewish inmates with Orthodox Judaism as the only sect of Judaism approved for kosher diets. (D.I. 45, ex. E) Pennell is aware that there are some groups that vary in their understanding and practice of the Jewish faith and clarifies that the Torah is specific on their observance. (Id.) Pennell's understanding is that, to be recognized as Jewish, "a rabbi will verify family history, etc." (Id.) Pennell's understanding through a rabbi is that a kosher diet is required by those who are Jewish. (Id.) According to Pennell, plaintiff told him he is a Jewish/Wiccan and, to Pennell's knowledge this is not a recognized sect of Judaism.[4] (Id.) Pennell states that, since July 16, 2012, he has consistently referred religious diet requests to the food services coordinator. (D.I. 45, ex. E)

On March 10, 2014, plaintiff received a memorandum from defendant food services administrator Senato advising plaintiff that he had received plaintiff's religious diet request but, for plaintiff to receive kosher meals, plaintiff needed a rabbi to verify that he was an Orthodox Jew. (D.I. 2, ex. 1) Plaintiff testified that Senato's letter was "seemingly" in response to his February 20, 2014 written request for a kosher diet

---

[4]Pennell explains that for an inmate to participate in Ramadan, the inmate "needs to be a Muslim and have taken their Shahaddah. [The] contractual Imam and Muslim community validates a list to [Pennell] each year who will be participating in Ramadan." (D.I. 45, ex. E)

5

addressed to the food services administrator.[5] (D.I. 45, ex. C; D.I. 64, ex. 1 at 57)

According to Senato, in March 2014, the DOC required that inmates who requested

kosher diets be Orthodox Jews, it was "their" understanding at that time that the law

required that only Orthodox Jews required kosher meals, and this is why plaintiff's

request for a kosher diet made prior to March 10, 2014 was denied.[6] (D.I. 64, ex. 1)

Senato understood that plaintiff was neither an Orthodox Jew nor Jewish. (Id.) In

addition, the policy required completion of a religious diet participation agreement by

Jewish inmates and (Senato explains that), at the time plaintiff was denied the kosher

diet, he had not yet completed the form. (Id.)

On March 11, 2014, plaintiff submitted a grievance requesting a kosher diet. He

was advised that "[i]t is the inmate's responsibility to tend to his own spiritual needs you

will need to write Chaplin [sic] Pennell with your request and he will advise you what you

need to do." (D.I. 2, ex. 1; D.I. 45, ex. E) Plaintiff submitted a DOC religious diet

participation agreement signed on March 28, 2014 for "kosher practicing" signed by

security staff on April 17, 2014. (D.I. 45, ex. C) Plaintiff commenced this action in early

April 2014, prior to the time the security staff signed off on the religious diet participation

agreement. (See D.I. 2)

---

[5]At his September 28, 2016 deposition, plaintiff testified that the first time he had in-person interaction with Senato occurred a few weeks prior to his deposition. (D.I. 64, ex. 1 at 44-46) Prior to that, plaintiff had not met with Senato "in person," but he had written communications with him (Id. at 45-47)

[6]Senato states that he did not draft the religious diet policy and had no input in the policy. (D.I. 64, ex. 1)

In an undated letter to Senato, plaintiff stated, "please stop refusing my kosher diet requests. My beliefs demand that I keep [k]osher to the level that I am capable of. The DOC, the food services, and the chaplain are not qualified to dictate my religious tenets." (Id.) In another undated letter, plaintiff wrote to Pennell regarding difficulties he encountered in his attempts to follow his religion and practice his faith. (D.I. 45, ex. H) Plaintiff related to Pennell that he was told that he was not "Jewish enough" for the DOC to provide him with a religious kosher diet. (Id.) Pennell responded, "please write to food services director for a food/diet form." (Id.)

On September 9, 2014, Pennell thanked plaintiff for his letter "on pursuing [his] faith." (D.I. 45, ex. A) Pennell advised plaintiff that he could use the Old Testament which includes the Torah in the practice of religious studies and advised plaintiff that he did not have other materials. (Id.) Pennell stated the other issue that needed to be addressed was plaintiff's "Jewish faith validation by an outside rabbi." (Id.) In the letter, Pennell noted that plaintiff had changed his faith to Jewish on February 28, 2014, but advised that "recognition is wholly different, this is your responsibility to have your recognition confirmed before any participation in services could be considered." (Id.) In turn, plaintiff asked Pennell to send him a Bible. (D.I. 45, ex. B) In another undated letter, plaintiff requested religious materials and asked to speak with a rabbi. (Id.)

Senato's responses to discovery state that plaintiff can "keep kosher in diet without the kosher diet plan. All vegetables and fruits are considered kosher. Foods that have been manufactured and packaged with the kosher seal are kosher. The religious vegetarian diet is an available option at any of the Delaware prisons. If the

7

    Case 1:14-cv-00446-SLR   Document 68   Filed 12/13/16   Page 9 of 25 PageID #: 683

plaintiff is permitted to purchase commissary, a long list of items available for his
purchase are identified as kosher." (D.I. 45, ex. E)

According to Senato, the religious diet policy changed in April 2016, and the old
one is no longer applied. (D.I. 64, ex. 1) Now, an inmate need not be Jewish to obtain
a kosher diet if he otherwise demonstrates that his request for a kosher diet is part of a
sincerely held religious belief, and he has completed the religious diet participation
agreement form. (Id.) As of April 6, 2016, plaintiff was authorized to receive a kosher
diet as a result of his religious accommodation request and, as represented by defense
counsel, he will continue to receive the diet. (D.I. 52, ex.)

On July 26, 2016, the court entered a memorandum and order that: (1) granted
plaintiff's motion to dismiss that portion of the complaint that sought injunctive relief;
(2) denied plaintiff's motion for summary judgment as to the RLUIPA claim for
damages; (3) granted defendants' motion for summary judgment as to the RLUIPA
claim for damages, as to Eleventh Amendment immunity issue with respect to the
§ 1983 claims against defendants in their official capacities, and in favor of Matthew
Dutton for lack of personal involvement; (4) found moot the claim for declaratory relief
under 42 U.S.C. § 1983 and RLUIPA; (5) held in abeyance rulings on the parties'
motions for summary judgment as to the First Amendment and equal protection claims;
and (6) denied defendants' motion for summary judgment on the qualified immunity
issue without prejudice to their ability to later raise the defense. (See D.I. 55, 56) As a
result of the ruling, the only remaining claims are the 42 U.S.C. § 1983 First
Amendment and equal protection claims that seek compensatory damages from
Senato and Pennell in their individual capacities.

8

## III. MOTIONS FOR SUMMARY JUDGMENT

### A. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). A party asserting that a fact cannot be--or, alternatively, is--genuinely disputed must be supported either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted). The court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The

judge must ask not whether the evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. *Id.* at 252. The court must not engage in the making of "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" as these "are jury functions, not those of a judge, [when] [] ruling on a motion for summary judgment." *E.E.O.C. v. GEI Group, Inc.*, 616 F.3d 265, 278 (3d Cir. 2010) (citation omitted).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586-87; *see also Podobnik v. U.S. Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). Although the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," a factual dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. at 247-48. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). The same

standards and burdens apply on cross-motions for summary judgment. *See Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987).

Plaintiff moves for summary judgment on the grounds that: (1) defendants have completely denied his right to practice his religion; (2) no genuine issues of material fact exist to justify denial of his motion; (3) there are no disputes to the facts of this case; and (4) as a matter of controlling law, the evidence must be recognized as proof positive that defendants have violated his rights and continue to do so. (D.I. 45) Defendants move for summary judgment on the grounds that: (1) they have qualified immunity from suit because plaintiff failed to show they violated his rights under federal law; (2) there is no evidence they violated plaintiff's First Amendment right or that they placed a substantial burden with respect to plaintiff practicing his chosen religion; and (3) they did not violate plaintiff's right to equal protection because plaintiff is not similarly situated to Jewish and/or Muslim inmates who receive dietary accommodations. (D.I. 48, 49)

## B. Discussion

As set forth in the complaint, two claims are raised: (1) denial of a kosher diet; and (2) defendants' unequal treatment of plaintiff's religious request and the requirements imposed upon plaintiff by defendants lack justification or a rational basis.[7]

---

[7]The complaint alleges that, as a class of one, defendants' requirement that plaintiff have Jewish ancestry (as one of the possible of two ways to be recognized as Jewish) violates his Fourteenth Amendment right to equal protection. (D.I. 2, Count Two).

11

Plaintiff's primary claim is that he was denied a kosher diet which is a vital part of his religious beliefs.[8] The First Amendment's protection of the right to exercise religious beliefs extends to all citizens, including inmates. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). Plaintiff raises free exercise of religion and religious equal protection claims. Plaintiff's free exercise and equal protection claims require him to prove that defendants' conduct was not "reasonably related to legitimate penological interests" under the four factor test set forth in *Turner v. Safley*, 482 U.S. 78, 89 (1987). *See DeHart v. Horn*, 227 F.3d 47, 61 (3d Cir. 2000) (the *Turner* analysis is "equally applicable" to equal protection claims). The *Turner* analysis is conducted as a second step only if plaintiff's allegations demonstrate that a constitutionally protected interest is at stake. *DeHart*, 227 F.3d at 51. "The mere assertion of a religious belief [by a prisoner] does not automatically trigger First Amendment protections . . . only those beliefs which are both sincerely held and religious in nature are entitled to constitutional protection." *Id.* (quoting *Africa v. Commonwealth of Pa.*, 662 F.2d 1025, 1029-30 (3d Cir. 1981)). If either of these two requirements is not satisfied, the court need not conduct a *Turner* analysis.[9] *Id.* at 51. Once a sincerely held religious belief has been demonstrated, an inmate may show that a prison regulation or practice violates the right

---

[8]In their respective motions, the parties discuss plaintiff's ability to exercise his faith apart from the denial of a kosher diet. The court does not construe the complaint as raising claims that defendants impeded plaintiff's ability to practice his religion except as arising from the denial of a religious diet. In addition, the evidence of record does not indicate that defendants interfered with plaintiff's religious practice, again, with the exception that it was two years before he was provided with the requested religious diet.

[9]The court did not discuss the issue of plaintiff's sincerely held beliefs in its July 26, 2016 memorandum opinion and order after concluding the issue was not in dispute. Defendants' supplemental brief (D.I. 64) now raises the issue.

12

to free exercise of religion by demonstrating that it violated the "reasonableness test" set forth in *Turner*, 482 U.S. 78.

Here, plaintiff professes to follow a religion that combines Judaism and Wicca and that follows certain Jewish tenets. Defendants now question whether plaintiff's religious beliefs are sincerely held (apparently at least during the two years when plaintiff was not provided a kosher diet), noting that he has changed his religion several times during his incarceration. (*See* D.I. 64, n.9) They contend that plaintiff's motion for summary judgment should be denied because there remain disputed material facts regarding his sincerity. (*See id.*) Conversely, plaintiff argues that defendants' position is absurd, they never questioned his sincerity, and his sincerity is "best described as obvious." (D.I. 65)

Because the issue of sincerity was not considered to be in dispute, there has been no discovery directed at the issue. Regardless, a review of the record reflects plaintiff's consistency in expressing his sincere religious beliefs. While defendants direct the court to their opposition to plaintiff's motion for injunctive relief as evidence that they never admitted that any of plaintiff's requests for religious accommodations constituted requests relating to sincerely held beliefs (D.I. 64 at 3), the injunctive relief opposition actually states that the DOC had not made a determination regarding the sincerity of plaintiff's change of faith but, rather, had asked plaintiff to comply with the change of faith process required to convert to Judaism. (D.I. 25, ¶7). At most, this indicates that defendants were investigating plaintiff's sincerity, but were not challenging it. *See Dehart*, 227 F.3d at 52 n.3 (prison officials allowed to make inquiries regarding sincerity and religious nature of inmate's belief when the inmate requests

13

special treatment). The court further observes that the April 2016 authorization allowing plaintiff to receive a kosher diet indicates that plaintiff's request for the kosher diet reflects a sincerely held religious belief.

The evidence of record indicates that plaintiff's First Amendment rights are implicated by the two-year denial of his dietary request; therefore, the court must determine whether there is undisputed evidence that the denial of plaintiff's request for a kosher diet was "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. In addition to the explanation that plaintiff was not entitled to a kosher diet because he was not an Orthodox Jew, defendants articulate (in their supplemental brief) additional penological interests to support their challenge to plaintiff's claims. They state that the religious diet policy "attempts to strike a balance between respecting inmates' dietary requirements under various religious beliefs and security interests, which include not providing meals that are ten times more expensive to an inmate who does not sincerely believe that such a diet is required by his religious beliefs." (D.I. 64 at 7)

The court first asks whether there is a "valid, rational connection between the prison regulation and the legitimate interest put forth to justify it." *Fontroy v. Beard*, 559 F.3d 173, 177 (3d Cir. 2009) (quoting *Monroe v. Beard*, 536 F.3d 198, 207 (3d Cir. 2008)). The DOC bears the burden of demonstrating the existence of this connection, and the court must "afford 'substantial deference' to [its] professional judgment." *Id.* If a "valid, rational connection" is established, the court considers three additional factors: "1) whether inmates have an alternative means of exercising the right; 2) the burden on prison resources that would be imposed by accommodating the right; and 3) whether

14

there are alternatives to the regulation that fully accommodate the inmate's rights at de minimis cost to valid penological objectives." *Fontroy*, 559 F.3d at 178. Prisons are not obligated to use the least restrictive means in furtherance of legitimate penological objectives. *Id.*

In the July 26, 2016 memorandum opinion and order, the court looked solely to Policy No. 5.3, and did not consider the rabbi verification or Orthodox Jew requirements or the two-year delay in authorizing plaintiff's receipt of a religious diet. In doing so, the court found that the first *Turner* factor favored defendants, as the stated purpose of Policy No. 5.3, on its face, was to provide a religious diet program to support the varied faiths of the offender population so that all inmates are provided with the "appropriate nutritional and caloric intake for all offenders in accordance with their faith-based requirements." (*See* D.I. 2, ex. 5; D.I. 55 at 16; D.I. 2, ex. 5).

The court considers the positions of the parties in the supplemental briefs and, in doing so, revisits the first *Turner* factor. Given plaintiff's change in religion, it was not unreasonable for defendants to question whether he possessed a sincerely held belief and whether the dietary requirements of his religion were what he claimed them to be. "[A] prison is entitled to assess whether an inmate's dietary requirements are motivated by 'sincerely held' religious beliefs . . . ." *Tapp v. Proto*, 404 F. App'x 563, 565 (3d Cir. 2010) (unpublished) (short two-week delay in providing acceptable kosher meals did not impinge on free exercise rights) (quoting *DeHart*, 227 F.3d at 51). "Consequently, prison officials are afforded a reasonable period of time necessary to conduct such an inquiry. If prison officials were required to serve special meals upon demand without

15

verification, the costs would be inordinate and the prison kitchen turned into a restaurant." *Maestre v. Wagner*, 2012 WL 299626, at \*6 (E.D. Pa. Feb. 1, 2012), *aff'd*, 502 F. App'x 129 (3d Cir. 2012) (unpublished). "Where a delay in providing an inmate with a religious diet is brief and caused by ordinary administrative delay, the inmate's religious rights are not violate." *Heim v. Moore*, 2012 WL 1118636, at \*4 (M.D. Pa. Apr. 3, 2012) (citation omitted).

The religious diet policy changed in April 2016 and, as explained by Senato, now an inmate need not be Jewish to obtain a kosher diet if he otherwise demonstrates that his request for a kosher diet is part of a sincerely held religious belief, and he has completed the religious diet participation agreement form. In this regard, the record demonstrates that: (1) plaintiff submitted a form to change his religious belief to Jewish on February 28, 2014; (2) Pennell approved the request to change plaintiff's religious belief on March 6, 2014; (3) Senato advised plaintiff on March 10, 2014 that he had received plaintiff's religious diet request but, before plaintiff could receive kosher meals, a rabbi needed to verify that plaintiff was an Orthodox Jew; (4) plaintiff submitted a DOC religious diet participation agreement for "kosher practicing" on March 28, 2014, signed by security staff on April 17, 2014; and (5) plaintiff was not authorized for a kosher diet until April 6, 2016. Defendants describe the two years as a "temporary denial." (*See* D.I. 64 at 6)

While plaintiff commenced this action within a few days after he submitted the religious diet participation agreement and before it had been signed by security staff, the alleged First Amendment violation was a continuing one for a two-year period, from April 2014 until April 6, 2016. Given this fact, the burden lies with defendants to

16

demonstrate that a two-year delay in providing a kosher diet to plaintiff was due to a legitimate penological interest.

A two-year delay in plaintiff's receipt of kosher meals, without any explanation for the delay (other than the April 2016 policy change), raises valid First Amendment questions. *See Heim*, 2012 WL 1118636 (court cannot determine that five and a half month delay in receipt of kosher meals, without any explanation for the delay, does not raise serious First Amendment questions). Indeed, the two-year delay is far longer than those delays courts have considered de minimus. *See, e.g.*, *Maestre v. Wagner*, 2012 WL 299626, at *6 (seven weeks between request for religious diet and prison diet insufficient to make out a constitutional violation); *Dove v. Broome Cnty. Corr. Facility*, 2011 WL 1118452, *9 (N.D.N.Y. Feb.17, 2011) (30-day deprivation of kosher diet did not violate inmate's First Amendment rights); *Tapp v. Stanley*, 2008 WL 4934592, at *8 (W.D.N.Y. Nov. 7, 2008) (77-day delay in providing a kosher diet served legitimate penological concerns); *McCormack v. Myers*, 2007 WL 1704905, at *4 (D.S.C. June 12, 2007) (no constitutional violation where delay in processing inmate's request for kosher meals resulted in denial of religious meals for two and a half months).

As previously discussed, Policy No. 5.3, on its face, was established to provide a religious diet program to support the varied faiths of the offender population. The policy provided that once signed documentation was submitted to the food services site, the offender would be given the appropriate meal within 24 to 48 hours. Here, it was two years before plaintiff received the diet he requested, even though he complied with the administrative requirements.

17

In addition, the July 26, 2016 memorandum opinion and order pointed out that defendants did not explain why the additional requirements (rabbi verification that plaintiff is an Orthodox Jew or of Jewish descent) not mentioned in Policy No. 5.3 were imposed upon plaintiff. (D.I. 56 at 17) The issue is significant because, in addressing a prisoner's request for a particular diet, the question is not whether such a diet is an orthodox requirement of a particular religion, but whether the prisoner's belief that such a diet is necessary is sincerely held and religious in nature in the prisoner's scheme of things. *See Dehart*, 227 F.3d at 51. In response to the court's concerns, Senato merely explains that it was the DOC's practice at the time that only Orthodox Jews required kosher meals. As noted, those requirements were not set forth in Policy No. 5.3. Therefore, the denial of plaintiff's request is not based on penological reasons, but because of the DOC's apparent theological view that only Orthodox Jews, those born Jewish, or those certified by a rabbi, required kosher meals.

Finally, while kosher diets are more expensive, defendants' position that the prison has an interest in not providing expensive meals to inmates who do not sincerely believe that such a diet is required falls short since, as discussed above, the sincerity of plaintiff's beliefs is not at issue. It follows that the cost of a religiously-based diet for an inmate who sincerely believes is not a balancing factor to consider. While the court recognizes that the judgment of prison officials is entitled to substantial deference, the determination at issue is not justified by the reasons articulated by defendants. *See, e.g., O'Lone v. Estate of Shabazz*, 482 U.S. 342, 353 (1987).

The court concludes that defendants have not met their burden to show there is a "valid, rational connection" between the two-year denial of plaintiff's request for a

18

kosher meal, the requirement for rabbi verification and/or status as an Orthodox Jew, and the interests defendants presented to justify the requirement. Although the *Turner* factors are intended to serve as guides to a single reasonableness standard, "the first factor looms especially large" because it "tends to encompass the remaining factors, and some of its criteria are apparently necessary conditions." *Waterman v. Farmer*, 183 F.3d 208, 213-14 (3d Cir. 1999) (quoting *Amatel v. Reno*, 156 F.3d 192, 196 (D.C. Cir. 1998)). Because the court concludes that, based upon the first factor, defendants are not entitled to summary judgment, the court need not address the other *Turner* factors. *See Fontroy*, 559 F.3d at 177 (citation omitted).

As to equal protection, plaintiff advances a class-of-one claim.[10] (D.I. 2, Count Two). The Equal Protection Clause of the Fourteenth Amendment directs that all similarly situated individuals be treated alike. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Under the class-of-one theory, a plaintiff may advance an equal protection claim absent membership in a protected class if: (1) plaintiff shows that defendants engaged in irrational and intentional differential treatment of him when compared with similarly situated individuals; (2) defendants did so intentionally; and (3) there was no rational basis for the difference in treatment. *See Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006). As previously noted, the *Turner* analysis discussed above is "equally applicable" to prisoners' equal protection claims. *See Williams v. Morton*, 343

---

[10]The Equal Protection Clause of the Fourteenth Amendment exists to protect similarly situated individuals from disparate treatment under the law or by some other state action. *Artway v. Attorney Gen. of New Jersey*, 81 F.3d 1235, 1267 (3d Cir. 1996).

F.3d 212, 221 (3d Cir. 2003). In light of the *Turner* analysis, the court reiterates its conclusion that defendants failed to provide a nexus between the requirements imposed upon plaintiff for authorization of a religious diet and legitimate penological interests; i.e., the distinction defendants drew between Orthodox Jews (or "verified Jews") and those who were not to justify refusal of a religious diet has no nexus to legitimate penological interests. For these reasons, the court finds that the DOC's religious diet policy in effect prior to April 6, 2016, as applied to plaintiff, was constitutionally infirm under *Turner*.

The court's inquiry does not stop here. Defendants argue that, to the extent the court determines the religious diet policy was applied in a manner that violated plaintiff's constitutional rights, defendants are immune from personal liability under the doctrine of qualified immunity. Plaintiff contends that defendants are not entitled to qualified immunity but, other than a single sentence, does not discuss the issue. (D.I. 50 at 1)

The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In determining whether the defense of qualified immunity is applicable, a court must conduct a two-pronged analysis. It must decide whether a plaintiff has pleaded a constitutional violation, and whether the constitutional right at issue was "clearly established" at the time of the alleged misconduct. *Id.* at 232. The right allegedly violated must be defined at the appropriate level of specificity before a court can

20

determine if it was "clearly established." *Wilson v. Layne*, 526 U.S. 603, 615 (1999); *see also Abdul–Akbar v. Watson*, 4 F.3d 195, 202 (3d Cir. 1993) (quoting *Good v. Dauphin Cnty. Soc. Servs. for Children & Youth*, 891 F.2d 1087, 1092 (3d Cir.1989) (explaining that the contours of the right must be sufficiently clear for "reasonable officials in the defendant's position at the relevant time [to] believe[ ], in light of what was in the decided case law, that their conduct would be unlawful")). Unless the answer to both questions is "yes," the official is entitled to qualified immunity. *See Pearson*, 555 U.S. at 232. Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

Third Circuit precedent provides that it is "clearly established in this Circuit that prisoners' general right to freely exercise their religion gives them the more specific right to be served religiously acceptable meals while in prison. It also had long been established that prison officials may constitutionally infringe that specific First Amendment right when prison administration so requires, but only when the infringement is reasonable under the *Turner* factors." *Potts v. Holt*, 617 F. App'x 148, 152 (3d Cir. 2015) (unpublished). The court considers defendants' claims of qualified immunity as they relate to damages claims asserted against them on the basis of their actions under the religious diet policy in effect prior to April 6, 2016.

The issue before the court is a complicated one, given the fact that the beliefs plaintiff developed through the years are a mixture of Wicca and Judaism. Case law with regard to this individualized religion is non-existent. Of note is the recognition by

21

courts that "the prison has no duty to recognize every minor religion or belief system that attracts at least two inmates." *Kaufman v. Paugh*, 733 F.3d 692, 698 (7th Cir. 2013).

The record at bar demonstrates that defendants, (1) who relied on a rabbi's guidance, (2) attempted to apply an existing policy (3) established by others (4) to an unknown belief system (5) espoused by an inmate who had not been entirely consistent with the characterization of his religious affiliations over the years. When the court considers the above, it is not apparent that defendants' application of the DOC religious diet policy in effect prior to April 6, 2016 to plaintiff's situation was clearly unconstitutional. Therefore, given the novel issue plaintiff presented to defendants, the court concludes that reasonable officials in their position at the relevant time would have no reason to believe that their conduct was unlawful. *See e.g., Sutton v. Rasheed*, 323 F.3d 236 (3d Cir. 2003) (as amended May 29, 2003) (state prison administrators who denied texts to restricted status prisoners (on basis that texts were not religious) were protected from award of damages under doctrine of qualified immunity, since it was questionable whether likely invalidity of application of policy was clearly established so that it should have been apparent to defendants); *Bramson v. Sulayman*, 2007 WL 203938 (D.N.J. Jan. 23, 2007), *aff'd*, 251 F. App'x 84 (3d Cir. 2007) (physician who implemented an existing policy that he, or any other reasonable person, would have no reason to believe is unconstitutional, is entitled to qualified immunity). For these reasons, the court will grant defendants' motion for summary judgment based upon their qualified immunity.

22

## IV. MOTION FOR RECONSIDERATION

Plaintiff moves for reconsideration of the July 26, 2016 memorandum opinion and order on the grounds that the ruling is prejudicial, not supported by the evidence, and there are no legitimate reasons to find in defendants' favor, plaintiff's rights are clearly established, and the law is clearly in plaintiff's favor. (D.I. 57)

The purpose of a motion for reconsideration is to "correct manifest errors of law or fact or to present newly discovered evidence." *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). "A proper Rule 59(e) motion . . . must rely on one of three grounds: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice. *Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir. 2010) (citing *North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995). The court has thoroughly reviewed the record. In doing so, it finds that plaintiff has failed to demonstrate grounds for reconsideration and, therefore, his motion will be denied.

In addition, the court will deny plaintiff's request for the undersigned's recusal. It is evident in reading plaintiff's motion that he seeks recusal based upon his displeasure with court rulings. A judge is required to recuse himself "in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). The test for recusal under § 455(a) is whether a "reasonable person, with knowledge of all the facts, would conclude that the judge's impartiality might reasonably be questioned," *In re Kensington*

23

*Int'l Ltd.*, 368 F.3d 289, 301 (3d Cir. 2004), not "whether a judge actually harbors bias against a party," *United States v. Kennedy*, 682 F.3d 244, 258 (3d Cir. 2012). Under § 455(b)(1), a judge is required to recuse himself "[w]here he has a personal bias or prejudice concerning a party."

Under either subsection, the bias necessary to require recusal generally "must stem from a source outside of the official proceedings." *Liteky v. United States*, 510 U.S. 540, 554 (1994); *Selkridge v. United of Omaha Life Ins. Co.*, 360 F.3d 155, 167 (3d Cir. 2004) (beliefs or opinions which merit recusal must involve an extrajudicial factor). Hence, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky*, 510 U.S. at 555. There is no basis for recusal.

## V. CONCLUSION

For the above reasons, the court will: (1) deny plaintiff's motion for summary judgment; (2) grant defendants' motion for summary judgment; and (2) deny plaintiff's motion for reconsideration.

A separate order shall issue.

24