# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD D. PARKELL, | : |
| Plaintiff, | : |
| v. | : C.A. No. 14-446-LPS |
| CHRISTOPHER SENATO, *et al.*, | : |
| Defendants. | : |

Beth Moskow-Schnoll, William J. Burton, BALLARD SPAHR LLP, Wilmington, DE

Attorneys for Plaintiffs.

Joseph C. Handlon, STATE OF DELAWARE DEPARTMENT OF JUSTICE, Wilmington, DE

Attorneys for Defendants.

# **MEMORANDUM OPINION**

March 31, 2019
Wilmington, Delaware

**STARK, U.S. District Judge:**

Plaintiff Donald Parkell, an inmate at the James T. Vaughn Correctional Center ("VCC") in Smyrna, Delaware, filed this action in April 2014 against three of the VCC's officials: Food Services Administrator Christopher Senato, Chaplain Frank Pennell, and Inmate Grievance Coordinator Matthew Dutton. Plaintiff alleged that Senato, Pennell, and Dutton denied him equal protection of the law and violated his rights protected by the First Amendment and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*, by failing to timely provide him with a kosher diet. Plaintiff sought an injunction to compel the Delaware Department of Correction ("DOC") to provide him a kosher diet, as well as damages against the three officials for violating his constitutional rights. Matthew Dutton has since been dismissed from the case. (D.I. 56)

Presently before the Court are cross-motions for summary judgment filed by Plaintiff and by remaining defendants Senato and Pennell ("Defendants"). (D.I. 94, 97) For the reasons set forth below, the Court will grant in part and deny in part both of the motions.

## I. BACKGROUND[1]

Prior to July 2012, DOC operational procedures required inmates who desired a food preference for religious reasons to contact the chaplain in writing. (D.I. 45 Ex. B at SOP A083, DOC015) In July 2012, that procedure was changed by way of DOC Policy No. 5.3,[2] which

---

[1] A detailed description of the factual background of this case is provided in the Memorandum Opinion addressing the parties' earlier motions for summary judgment. (D.I. 68 at 1-8)

[2] Policy No. 5.3 provided for both practicing and non-practicing Jewish inmates to receive kosher meals. (*See* D.I. 45 Ex. B at Policy No. 5.3, DOC014) Practicing inmates received kosher meals every day, but non-practicing inmates received kosher meals only during holiday observances. (*Id.*)

1

provided that an inmate seeking a religious diet must self-report a religious faith, complete and sign a Religious Diet Participation Agreement, have it signed by security staff, and submit it directly to the Food Services unit. (D.I. 45 Ex. B at Policy No. 5.3, DOC014) Once received by the Food Services unit, the inmate would be provided the appropriate meal within 24 to 48 hours. (*See id.*)

When Plaintiff began his incarceration at VCC in January 2014, his intake form listed him as "Roman Catholic." (D.I. 2 Ex. 2) In February 2014, however, Plaintiff contacted the VCC chapel office seeking to change his faith records to Judaism[3] and to receive a kosher diet. (D.I. 2 Ex. 2; D.I. 45 Ex. B at DOC026) After receiving Plaintiff's request, Chaplain Pennell replied on February 20, asking Plaintiff if he was of Jewish descent or if he had contacted a rabbi to discuss the process of converting to Judaism. (*Id.* at DOC025) Pennell told Plaintiff that once he answered the questions, Pennell would send the Change of Faith form. (*Id.*) Plaintiff replied the following day, and Pennell sent Plaintiff the form on February 25, 2014. (*Id.* at DOC021-24) Plaintiff completed and submitted the form on February 28, 2014. Plaintiff's request to be listed as Jewish was then approved on March 3, 2014. (*Id.* at DOC017, 020-21)

On February 20, 2014 – prior to completing the Change of Faith Form – Plaintiff wrote to Defendant Food Services Administrator Senato requesting a kosher diet. (D.I. 45 Ex. C at DOC009; D.I. 64-2 at 57) But on March 10, 2014 – after the Change of Faith form had been approved – Plaintiff received a memorandum from Senato advising Plaintiff that in order to

---

[3] As noted by the Third Circuit, "Parkell has consistently self-identified throughout this litigation as 'Jewish/Wicca.'" *Parkell v. Senato, Parkell v. Senato*, 704 F. App'x 122, 124 n.1 (3d Cir. 2017). His complaint alleges that while he "believe[s] in the Jewish interpretation of God, morality, law, nature," he also holds "one irreconcilable belief" which, he contends, "will not allow a Rabbi to recognize my faith as Jewish, the belief in a dualistic deity." *Id.*

2

receive kosher meals, Plaintiff needed a rabbi to verify that he was Orthodox Jewish. (D.I. 2 Ex. 1) The following day, Plaintiff submitted a grievance to Inmate Grievance Coordinator Dutton requesting a kosher diet, but his grievance was returned unprocessed as improperly seeking a "request." (D.I. 2 Ex. 3) Dutton directed Plaintiff to write to Chaplain Pennell with the request. (*Id.*)

Rather than reach out to Pennell for at least the second time, on March 28, 2014 Plaintiff submitted a Religious Diet Participation Agreement, identifying himself as "kosher practicing." (D.I. 45 Ex. C at DOC008) Plaintiff commenced this action 11 days later, on April 8, 2014. (D.I. 2) Six days after that, on April 17, 2014, DOC security staff signed his Religious Diet Participation Agreement. (*See* D.I. 45 Ex. C at DOC008)

Despite having a signed Religious Diet Participation Agreement as of April 2014, DOC denied Plaintiff a kosher diet for two more years. (D.I. 53) At one point, Plaintiff sent a letter (which is undated) to Defendant Senato again requesting that he receive kosher meals, and another undated letter to Pennell discussing his difficulties trying to secure kosher meals. (D.I. 45 Ex. C at DOC007; Ex. H) It was not until April 6, 2016 – when, according to Senato, DOC's new policy allowed non-Jewish inmates to receive kosher meals as long as they held a sincere religious belief – that Plaintiff began receiving kosher meals. (D.I. 64-1) Plaintiff, consequently, voluntarily dismissed his request for injunctive relief. (D.I. 52, 53, 56)

As for the remaining claims, by order entered on July 27, 2016, the Court granted in part Defendants' motion for summary judgment after concluding that Inmate Grievance Coordinator Dutton lacked sufficient personal involvement in the decision to deny Plaintiff a kosher diet and that Plaintiff's RLUIPA claim was moot because he had voluntarily dismissed his request for injunctive relief. (D.I. 55, 56) In a subsequent December 13, 2016 order, the Court granted

Defendants' motion for summary judgment on the remaining equal protection and First Amendment claims, concluding that Defendants were entitled to qualified immunity. (D.I. 68) Plaintiff appealed.

On appeal, the Third Circuit affirmed the July 2016 order, but reversed and vacated the portion of the December 2016 order affording Defendants qualified immunity on Plaintiff's First Amendment claim.[4] (D.I. 75) While this Court had reasoned that qualified immunity applied because Plaintiff's novel religious beliefs[5] would leave "reasonable officials [with] no reason to believe that their conduct was unlawful" (D.I. 68), the Third Circuit concluded that "'officials can still be on notice that their conduct violates established law even in novel factual circumstances.'" *Parkell v. Senato*, 704 F. App'x 122, 126 (3d Cir. 2017) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

On remand,[6] both parties again move for summary judgment on the one remaining claim: Plaintiff's First Amendment claim. Plaintiff argues that the Court has already decided that his religious beliefs are sincere and that the Defendants' actions were constitutionally "infirm." (D.I. 98) Thus, since Defendants cannot invoke qualified immunity, summary judgment should be granted in Plaintiff's favor under law-of-the-case doctrine. (*Id.*) In the alternative, should the Court revisit these issues, Plaintiff contends it should, again, find in his favor. (*Id.* at 16-18) Defendants move for summary judgment on the grounds that: (1) at least Defendant Pennell should be dismissed from the case because he did not participate in the decision to deny Plaintiff

---

[4] The Third Circuit also found that Plaintiff's "class-of-one" equal protection claim fails and could be dismissed by this Court. *See Parkell*, 704 F. App'x at 125 n.6.

[5] *See supra* n.3.

[6] The case was reassigned from the now-retired Honorable Sue L. Robinson to the undersigned Judge on August 9, 2017.

4

a kosher diet; (2) Plaintiff failed to exhaust his administrative remedies; and (3) notwithstanding the Third Circuit's ruling, Defendants are still protected by qualified immunity. (D.I. 95)

Briefing on the motions was completed on July 19, 2018. (*See* D.I. 95, 98, 101-04) The Court heard oral argument on November 2, 2018. (D.I. 108) ("Tr.")

## II. LEGAL STANDARDS

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). An assertion that a fact cannot be – or, alternatively, is – genuinely disputed must be supported either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475

5

U.S. at 586; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). Thus, the "mere existence of a scintilla of evidence" in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment; there must be "evidence on which the jury could reasonably find" for the nonmoving party. *Anderson*, 477 U.S. at 252.

### III. DISCUSSION

#### A. Qualified Immunity

"From the earliest days of the republic, and continuing through today, the Supreme Court has 'consistently held that an inferior court has no power or authority to deviate from the mandate issued by an appellate court.'" *United States v. Kennedy*, 682 F.3d 244, 252 (3d Cir. 2012) (quoting *Briggs v. Pa. R. Co.*, 334 U.S. 304, 306 (1948)). "It is axiomatic that on remand for further proceedings after [a] decision by an appellate court, the trial court must proceed in

6

accordance with the mandate and the law of the case as established on appeal." *Bankers Trust Co. v. Bethlehem Steel Corp.*, 761 F.2d 943, 949 (3d Cir. 1985).

In resolving Parkell's appeal, the Court of Appeals for the Third Circuit held:

> Accordingly, we will vacate the portion of the District Court's order affording Senato and Pennell qualified immunity on Parkell's First Amendment claim and remand for further proceedings consistent with this opinion. We will affirm the District Court's decision in all other respects.

*Parkell*, 704 F. App'x at 127 (internal footnote omitted).

Thus, the Court is compelled to decline Defendants' invitation to reconsider, disregard, or overrule the Third Circuit's decision that qualified immunity is not available to Defendants in this case. (*See* D.I. 94 at 11-16; Tr. at 25-26, 28, 31-35)

### B. First Amendment Claim

The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I. The First Amendment is incorporated by the Fourteenth Amendment and, therefore, applies to the states. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

"Inmates clearly retain protections afforded by the First Amendment, . . . including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987) (internal citation omitted). The Third Circuit has held that "prisoners' general right to freely exercise their religion gives them the more specific right to be served religiously acceptable meals while in prison." *Potts v. Holt*, 617 F. App'x 148, 152 (3d Cir. 2015).

Only those beliefs that are "(1) sincerely held, and (2) religious in nature, in the claimant's scheme of things" are afforded First Amendment protections. *Africa v. Pennsylvania*,

7

662 F.2d 1025, 1030 (3d Cir. 1981). If both of these requirements are met, the Court must then determine "whether a legitimate and reasonably exercised state interest outweighs the proffered first amendment claim." *Id.* In making this determination, the court is to apply the "reasonableness test" set forth in *Turner v. Safley*, 482 U.S. 78, 89 (1987). The *Turner* test considers whether: (1) the regulation or practice in question furthers a legitimate governmental interest unrelated to the suppression of expression; (2) there are alternative means of exercising First Amendment rights that remain open to prison inmates; (3) the right can be exercised only at the cost of less liberty and safety for guards and other prisoners; and (4) an alternative exists which would fully accommodate the prisoners' rights at *de minimis* cost to valid penological interests. *See Thornburg v. Abbott*, 490 U.S. 401, 415-16 (1989); *Turner*, 482 U.S. at 89-91.

Plaintiff argues that the sincerity of his religious beliefs has already been resolved by both the Correction Center staff – evinced by the fact that he now receives kosher meals, a prerequisite for which was a finding of a sincerely-held belief – and this Court; therefore, in his view, he is entitled to summary judgment. (D.I. 98 at 12-13) In the alternative, Plaintiff seeks to prove his sincerity by pointing to the religious literature he carries with him and the fact that no inmate would seek out kosher meals without a sincere religious belief, given their inferior quality. (*See id.* at 2-5, 13)

While Defendants now claim that they have challenged the sincerity of Plaintiff's belief (D.I. 101 at 15), the record does not support their assertions.[7] The issue of Plaintiff's sincerity

---

[7] Defendants also point to the Third Circuit's statement that on remand Plaintiff "will still need to persuade a jury that his sincerely held religious beliefs required him to eat a kosher diet." *Parkell*, 704 F. App'x at 127. The Court reads this statement as indicating that the Third Circuit's holding was limited to the legal question of whether qualified immunity applied and acknowledging the different roles of the Court in connection with immunity and the factfinder in connection with other portions of the case. While the Third Circuit was not absolving Plaintiff

8

was not raised in Defendant Senato's rejection of Plaintiff's request for a kosher diet (D.I. 2 Ex. 1), during the grievance process (D.I. 2 Ex. 3), or in Defendants' initial motion for summary judgment (*see generally*, D.I. 49). Defendants even concede that they made no effort to determine Plaintiff's sincerity, and instead focused on evenly applying the alleged DOC policy limiting kosher meals to only those who were Orthodox Jewish. (D.I. 101 at 7; *see also* Tr. at 37 (admitting "[t]here is no express evidence from their mouths or their pen that they didn't believe it. . . . They really didn't get to this sincerity I guess at this point because they had [the DOC] policy" that you had to be Orthodox Jewish)) Consequently, the Court has repeatedly stated that Plaintiff's sincerity is not in dispute. (D.I. 55 at 9 ("Plaintiff has followed his religious beliefs for ten years, and there is no evidence of record that defendants dispute the sincerity of his beliefs."); *id.* at 15 ("As discussed, there is no dispute over plaintiff's sincerity."); D.I. 68 at 13 ("[T]he issue of sincerity was not considered to be in dispute.").

Even if the Court were to revisit the issue, there is no genuine dispute of material fact as to the sincerity of Plaintiff's beliefs. Plaintiff provided detailed testimony that he has been practicing his own form of Judaism for over a decade, mixed with Wicca mysticism and the recognition of a divine female counterpart to the traditional male deity. (D.I. 64-2 at 16-18; D.I. 55 at 15) His sincerity is also reflected in the correspondence he sent in repeated attempts to secure a kosher diet and religious materials he possesses. (D.I. 99 Ex. A, D, J) Defendants fail to provide any evidence undercutting Plaintiff's alleged sincerity. *See Brown v. Johnson*, 116 F. App'x 342, 345 (3d Cir. 2004) ("[I]t is up to the prisons themselves to assert challenges to the

---

of his obligation to prove the affirmative aspects of his case, it was also not erasing the impact on remand of any facts that were not in dispute (or facts for which Defendants had already waived their opportunity to contest).

9

sincerity or religious nature of a prisoner's beliefs, and where no such challenges are made, the religious nature and sincerity of the beliefs are assumed."). Given the evidence proffered by Plaintiff, and Defendants' repeated failure to offer any evidence to the contrary, the Court finds there is no dispute of material fact as to Plaintiff's sincerity, and concludes that Plaintiff had a First Amendment interest in securing a kosher diet.

Accordingly, the Court must next turn to the *Turner* factors to determine whether Defendants reasonably impinged Plaintiff's right because of a valid penological interest. In this case, the Court has already provided a thorough analysis applying *Turner* and determined that "[D]efendants have not met their burden to show there is a 'valid, rational connection' between the two-year denial of plaintiff's request for a kosher meal, the requirement for rabbi verification and/or status as an Orthodox Jew, and the interests defendants presented to justify the requirement." (D.I. 68 at 14-19) Defendants ask the Court to revisit its prior conclusion based on allegedly new evidence. (D.I. 101 at 7-9) Reconsideration of a previously-decided issue may be appropriate when the record contains new evidence, but "only if the new evidence differs materially from the evidence of record when the issue was first decided." *Hamilton v. Leavy*, 322 F.3d 776, 787 (3d Cir. 2003); *see also In re Continental Airlines, Inc.*, 279 F.3d 226, 232 (3d Cir. 2002) (discussing how law-of-the-case doctrine "limits relitigation of an issue once it has been decided" in earlier stage of same litigation). Defendants have failed to meet this standard. Defendants present as new material evidence Defendant Senato's deposition testimony that he denied Plaintiff a kosher diet because he was applying DOC policy as he understood it. (D.I. 101

at 8) This evidence does not go to any of the *Turner* factors, but rather to who should ultimately be held responsible for the alleged Constitutional violation: Defendants or DOC.[8]

Hence, the Court finds there is no dispute of material fact as to Plaintiff's First Amendment claim, and summary judgment is warranted in favor of Plaintiff. However, summary judgment will be entered only against Defendant Senato,[9] for reasons to be discussed next.

### C. Defendant Pennell

Defendants move to have Defendant Pennell dismissed from the case, on the basis that he was not involved in the decision to deny Plaintiff a kosher diet. (D.I. 95 at 10) Plaintiff counters that Pennell was instrumental in propagating the alleged unwritten policy that only those verified as Orthodox Jewish may receive a kosher diet. (D.I. 102 at 8) Based on the record, no reasonable finder of fact could find that Pennell had personal involvement in the decision to deny Plaintiff a kosher diet. Therefore, summary judgment will be granted in Pennell's favor.

---

[8] While Defendants argue that "[t]here is no legal basis for extending personal liability to Defendants in their individual capacities for policies they did not create" (D.I. 101 at 8), Defendants cite no legal authority for this proposition, and courts have not limited potential liability to policymakers on these grounds. *See Csizmadia v. Fauver*, 746 F. Supp. 483, 467-88, 490 (D.N.J. 1990) (allowing individual-capacity suit against New Jersey DOC policymakers as well as those employees/officers who enforced policy, although also concluding employees/officers were protected by qualified immunity – which here is not available to Defendants, based on Third Circuit's decision).

[9] The Court acknowledges the oddity – and at least arguably unfairness – that the only person liable for the violation of Parkell's constitutional rights is Senato, a Food Services Manager who was evidently complying with an unwritten policy and practice of limiting kosher meals to inmates who are Orthodox Jewish. Even Plaintiff seems to acknowledge that this appeared to be DOC's policy, as he was denied kosher meals at more than one DOC facility. (D.I. 64-2 at 43-44) Still, given the decision on appeal regarding no qualified immunity, the uncontested facts as to Plaintiff's sincerely-held beliefs, the lack of new evidence to disturb the law-of-the-case application of the *Turner* factors, and the other reasons given throughout this Opinion, the inexorable result is that Senato (and only Senato) is liable.

11

"An individual government defendant in a civil rights action must have personal involvement in the alleged wrongdoing . . . ." *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (internal quotation and brackets omitted). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). "Facts showing personal involvement of the defendant must be asserted; such assertions may be made through allegations of specific facts showing that a defendant expressly directed the deprivation of a plaintiff[']s constitutional rights or created such policies where the subordinates had no discretion in applying the policies in a fashion other than the one which actually produced the alleged deprivation." *Rahim v. Holden*, 831 F. Supp. 2d 845, 849-50 (D. Del. 2011) (citing *Sample v. Diecks*, 885 F.2d 1099, 1117-18 (3d Cir. 1989)).

The record establishes that Pennell provided no obstacle to Plaintiff's attempts to change his faith records in order to receive a kosher diet. Plaintiff sought to change his faith records from "Roman Catholic" to "Jewish" sometime in February 2014. (D.I. 2 Ex. 2) Pennell replied on February 20, 2014, indicating he was receptive to helping Plaintiff change his faith records and asking a few questions. (*Id.*) Plaintiff responded to Pennell the following day (D.I. 99 Ex. A) and four days later Pennell provided Plaintiff the Change of Faith Form. Pennell then approved the request within a week of receiving Plaintiff's completed form. (D.I. 99 Ex. G) Pennell followed all applicable DOC policies and performed all procedures required of him. Once Plaintiff completed the Change of Faith Form, Policy No. 5.3 required Plaintiff to complete a Religious Diet Participation Agreement, which only Food Services unit staff could approve or reject. (D.I. 45 Ex. B at Policy No. 5.3, DOC014) There is no evidence that Pennell had any involvement with the processing of the Religious Diet Participation Agreement.

The record also does not support Plaintiff's argument that Pennell propagated the alleged unwritten policy that only those who are Orthodox Jewish may receive a kosher diet. Plaintiff points to Pennell's deposition testimony, arguing that Pennell required a rabbi to verify whether inmates were Orthodox Jewish. (D.I. 102 at 7-8) However, Pennell's testimony discusses only the distinction between declaring oneself "Jewish" and being "validated" by the Jewish community – whether it be through lineage or conversion – which is necessary in order to participate in religious services. (D.I. 99 Ex. B at 71-72) In fact, Pennell specifically testified that daily kosher meals were not reserved only for those who were Orthodox Jewish, but rather those who were "practicing" the Jewish faith, as compared to those who were "non-practicing" (who received kosher meals only on holidays). (*Id.* at 81-84) Pennell further testified (without contradiction in the record) that he did not know how DOC distinguished between practicing and non-practicing inmates for purposes of the religious diet program "because [he] was not asked for input in putting the policy together." (*Id.* at 82)

While Pennell may have been an actor in Plaintiff's attempts to secure a kosher diet, Plaintiff has not set forth any facts indicating that Pennell was involved in the decision to deny him a kosher diet. For these reasons, Defendants' motion for summary judgment as to the claims against Defendant Pennell will be granted.

### D. Exhaustion of Administrative Remedies

Defendants argue for the first time that summary judgment should be granted in their favor because Plaintiff failed to exhaust his administrative remedies. (D.I. 95 at 10-11) The Prisoner Litigation Reform Act ("PLRA") provides that no action shall be brought by a prisoner, with respect to prison conditions, until all available administrative remedies are exhausted. 42 U.S.C. § 1997e(a). "[T]o properly exhaust administrative remedies prisoners must 'complete

13

the administrative review process in accordance with the applicable procedural rules,' . . . rules that are defined not by the PLRA, but by the prison grievance process itself." *Jones v. Bock,* 549 U.S. 199, 218 (2007) (quoting *Woodford v. Ngo,* 548 U.S. 81, 88 (2006)). The Third Circuit has held that to complete the administrative review process, an inmate need only show "substantial" compliance with the prison's grievance procedures. *Small v. Camden Cty.,* 728 F.3d 265, 272 (3d Cir. 2013).

Failure to exhaust administrative remedies is "an affirmative defense to be pleaded by the defendant." *Ray v. Kertes,* 285 F.3d 287, 295 (3d Cir. 2002). A defendant's failure to raise an affirmative defense in a responsive pleading or appropriate motion generally results in waiver of the defense. *See Charpentier v. Godsil,* 937 F.2d 859, 863 (3d Cir. 1991). However, Federal Rule of Civil Procedure 15(a) permits the Court to grant leave to amend a responsive pleading to include an affirmative defense, and the Third Circuit has held that "[u]nless the opposing party will be prejudiced, leave to amend should generally be allowed." *Id.* at 864. When no answer has been filed, affirmative defenses should still be raised early in the proceedings. *See Williams v. Murdock,* 330 F.2d 745, 749 (3d Cir. 1964) (noting that where no answer is filed, affirmative defense must be raised in motion to dismiss or "asserted successfully at the early stage of th[e] proceeding"); *see also United States v. Bendolph,* 409 F.3d 155, 173 (3d Cir. 2005) ("The very purpose of affirmative defenses . . . is to conserve judicial resources by requiring the parties to raise them *early* in the proceedings.").

The Court agrees with Plaintiff that the situation here is similar to that in *Jones v. Gardels,* where this Court found that defendants had waived their affirmative defense of exhaustion when they (i) did not file an answer; (ii) did not raise the issue in discovery responses; and (iii) raised the issue for the first time on summary judgment, three years after the

complaint had been filed and nearly two months after the close of discovery. *See* 2006 WL 37039, at *3 (D. Del. Jan 6, 2006). Here, too, Defendants have not filed an answer, so no responsive pleading is in the docket and available to be amended. More importantly, Defendants only first raised the affirmative defense of failure to exhaust administrative remedies in their pending motion for summary judgment, which was filed more than four years after the Complaint, after two previous rounds of summary judgment briefing, and almost a month after the close of discovery.[10] Under these circumstances, Plaintiff would be prejudiced[11] by allowing Defendants to add this new defense at this late stage of the case. Therefore, the Court holds that Defendants have waived the affirmative defense of failure to exhaust administrative remedies.

## IV. CONCLUSION

For the reasons stated above, the Court will grant in part and deny in part both summary judgment motions. Summary judgment will be entered for Plaintiff and against Senato on Plaintiff's First Amendment claim. Summary judgment will be entered for Pennell and against Plaintiff on that same First Amendment claim. An appropriate order follows.

---

[10] Defendants argue that it was only during Dutton's deposition that they learned that Plaintiff could have filed another grievance. (D.I. 103 at 7) But Dutton was initially a named Defendant, and Defendants had access to this information from the start of the case. *See Inline Connection Corp. v. AOL Time Warner Inc.*, 237 F.R.D. 361, 368 (D. Del. 2006) ("It is not for a party to unilaterally determine that it may delay moving to amend its pleadings when it has access to the information necessary for such amendment. Moreover, defendants certainly could have taken this period to reexamine their pleadings and the information in their possession and timely-filed any motion to amend they deemed warranted.").

[11] While the relevant parties have already been deposed, Defendants' assertion of a new affirmative defense of failure to exhaust administrative remedies would likely require additional inquiry into the practical availability of the VCC grievance process.

15